Christopher L. Cauble, OSB No. 962374
ccauble@thecaublefirm.com
**Cauble, Selvig & Whittington, LLP**
111 SE Sixth St.
Grants Pass, OR 97526
Telephone: (541) 476-8825
Facsimile: (541) 471-1704

Attorney for Defendant

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
### MEDFORD DIVISION

| | |
|---|---|
| FOUNDATION OF HUMAN UNDERSTANDING,<br><br>Plaintiff,<br><br>v.<br><br>TALK RADIO NETWORK, INC., a DELAWARE CORPORATION,<br><br>Defendant, and<br>Counter Claimant. | Case No.: 1:20-cv-01652-AA<br><br>DECLARATION OF MARK MASTERS IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER. |

I, Mark Masters, state and declare as follows:

1.  I am the CEO of defendant and counter claimant, Talk Radio Network, Inc. ("Herein after the term "TRN" will be used to refer to Defendant and Counter Claimant and for ease of reference to the broader panoplies of "TRN Companies").

2.  I have personal knowledge of the matters addressed in this declaration and could testify competently thereto if called upon to do so.

3.  I have reviewed the declarations of Alan Masters("Alan"), Diane Linderman ("Diane") and David Masters ("David") and make this declaration both in response/refutation

of those declarations, and in support of TRN's response to the pending application for a temporary restraining order by the Foundation of Human Understanding.

4. In 2002 I was a member of the Board of Directors for the Foundation of Human Understanding ("FHU").

5. In 2002, I participated in a conference call hearing with the FHU tax attorney, a Judge from the U.S. Treasury Department and agents from the IRS. The hearing was to determine if the Judge would grant a motion to revoke the non-profit status of FHU.

6. I had no prior knowledge of the hearing or contact from the tax attorney for FHU with regard to any tax matter or investigation until shortly before my participation in the hearing.

7. I recall that the agents for the IRS began the hearing by asking FHU's attorney why the IRS had received no information from the FHU despite having asked for it for over a year, and the FHU attorney replying that he had received no response from FHU.

8. I informed the judge that FHU would be dismissing its present counsel in the matter and requested a 60-day extension in order for FHU to provide the requested information.

9. In the 60 days following the hearing, I utilized all staff at my disposal at both TRN and FHU to gather the information and present it to the IRS. A total of 24 banker's boxes of materials of records of FHU were shipped to the IRS, and as a result, the summary judgment motion was set aside, and an audit of the FHU began.

10. FHU also engaged new counsel during the period immediately following the hearing. The new tax counsel continued to advise the FHU through the tax audit that continued with actions and investigations through a hearing in the U.S. Supreme Court in

2010.

11. With many communications, with me and other agents for FHU, through various means, the IRS set out the conditions upon which the FHU could maintain its 501c(3) non-profit status.

12. In the process of the audit by the IRS, conducted in the 2002 to 2010 time frame, it was my understanding that, the IRS had indicated that it anticipated returning for a follow-on audit upon the death of founder, Roy Masters ("Roy") to determine if the FHU still could maintain its 501c(3) status.

13. Among the conditions that the directors of FHU understood the IRS to be concerned with were: a) the founder position continue after the Roy's death, and b) the continuation of the purpose and message as declared by the governing documents of the FHU. My understanding was that a key issue for the IRS was the propensity for "family churches", such as the IRS considered the FHU, to become corrupted after the death of the original founder of the organization, and that the assets were often usurped and converted by other family members, to their own uses in violation of the non-profit rules.

14. In 2003, the Board of FHU, consisting of Roy, Ann Masters, Dianne Linderman , David and Mark Masters, adopted an amendment to Article III of the By-Laws of FHU, which changed the chain of the successor founder position and placed Mark Masters in the role of first successor founder, then be followed by the committee if he was deceased or could not serve. All 5 directors then consented to the amendment by resolution executed on September 28, 2003.

15. I personally witnessed each member of the board of directors sign the September 28, 2003 "consent to action", as a binding amendment to the FHU bylaws, by and through

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 3

the board members' unanimous assent.

16. Attached hereto as Exhibit "H" is a true and correct copy of report of Travis King, a document examiner and handwriting expert, who examined the original 2003 Consent document.

17. Through its audit of the 1998, 1999, and 2000 tax records of the FHU, the IRS had determined that the members of the Board of Directors of the FHU, excluding only myself, had collectively received inurement from FHU of more than $250,000.00 over the previous 5 years of their various tenures. Because I was the only member of the board that was found to have not accepted any pay nor receive inurement of any kind, and since I was also the sole FHU executive to make sure the FHU complied with the IRS demands so it was able to keep its tax exempt status (which made me intimately involved with all specific issues needed for this to remain) it was determined that I would be the next singular successor founder and would therefore face the promised future IRS audit that would take place after the original founders passing. From the beginning of this 2002 tax audit, I would go on to spend a total of 8 years protecting and defending FHU's nonprofit 501 C3 tax exempt status culminating in the FHU's final filing on this matter in late 2010 in the Supreme Court of the United States.

18. In the process of the audit by the IRS, conducted in the 2002-to-2010-time frame, it was my understanding that, the IRS had indicated that it anticipated returning for a follow-on audit upon the death of Roy to determine if the FHU still could maintain its 501c(3) status.

19. Another concern expressed by the IRS audit was the continuity of the message and mission of the FHU, after the death of its original founder. To meet this concern, the

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 4

FHU agreed that there would never be an actual "replacement" host for Roy, but rather, the FHU would insure its national radio program would continue airing "evergreen" recordings of over 30 years of Roy Masters original recorded programs, reassuring the IRS that the same messaging and on air philosophy would be the same prerecorded voice that would continue the continuity of its existence into the future. This was an accepted strategy, used by other nationally broadcast focused non-profits to continue the message of the founding personalities.

20. At the October 1, 1999 meeting of FHU's board of directors (the "Board"), the Board reviewed a letter from then FHU Counsel set forth as Exhibit "A" hereto (the "Attorney Letter"), which enclosed a proposed written consent to the transfer of FHU's Central Point facilities at 724, 734 and 744 Pine Street ("Central Point") to FHU's then wholly-owned subsidiary Talk Radio Network, Inc., an Oregon corporation ("OTRN").

21. Included with the September 27, 1999 letter was also a Bargain & Sale deed, prepared by the firm of Anderson, Krehbiel, McCreary & Bryan, to be executed by me as the designated representative of FHU under the Consent to Action.

22. I and each other member of the Board personally executed that consent (the "Consent") at that October 1st meeting in the presence of the other directors, and I personally observed each other member of the Board, including Alan, Diane and David, execute the Consent.

23. A true and correct copy of the Consent, as so executed, is set forth as Exhibit "B" hereto and incorporated herein by this reference.

24. I have the fully-executed original of the Consent, which I am willing to submit to any signature or handwriting expert that the court should prefer for authentication.

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 5

25. Since around 1996, Alan had been in the position of borrowing more & more money from friends of Roy and followers of FHU in order to keep his failing used car lot alive. By the late 1990's Alan had started borrowing heavily from numerous people, including myself, and ultimately, our father, Roy. Around the years 1996 to year 2000, Alan moved into our father's home to save money. In addition, Roy said that, fearing that his son could go to jail for fraud or worse, he then loaned Alan what he described as his entire life's cash savings in the amount of $200,000.

26. Roy stated that he did so believing that Alan would pay off all of his debts, get out of trouble and "clean up his affairs so that they would not be a blemish on the family reputation", or words to that effect.

27. Following that October 1, 1999 board meeting, Roy removed Alan from the FHU board for cause. because he had borrowed substantial amounts of money from FHU parishioners and failed to pay those moneys back. It is my understanding that the total amount is approximately $800,000.

28. Roy stated that he had serious concerns about Alan borrowing so much from long time FHU parishioners, and that Alan defaulting on those loans could potentially "leak" into the FHU's larger reputation. So, Roy removed Alan from the Board. Roy steadfastly maintained that separation between Alan and FHU for around 17 years, until for reasons that will be addressed below, Roy reappointed Alan to the Board in 2017.

29. Up until around 2002, Alan had also been an on-air host for certain TRN weekend radio shows, such as "Motor Trend Radio" & "Car & Driver".

30. Around 2001 it was discovered by Michael Lofrano, a TRN Vice President, that Alan, in his role as a weekend host for a TRN program, had been taking

"financial kick-backs under the table" from guests he interviewed on these national talk programs. This was a violation of FCC commercial content laws, as well as a violation of the federal rules which governed "payola".

31. Further investigation discovered that multiple checks-in-return-for-interviews had been sent directly to Alan c/o OTRN, and that this had happened over at least a one-year period. As a result, Alan's hosting and other connections with OTRN were ended, for cause.

32. Alan then set up his own independent network syndication company. I had very limited interaction with Alan and his wholly owned "Benchmark Media" (or his wholly owned "Entertainment Radio Network") for about eight years, until around 2010, when I was called to Roy Master's home for an unscheduled meeting with him and Alan.

33. By 2010 Alan's privately held indie radio network company was (and still is) an active network radio competitor to the TRN brand. At that 2010 meeting, the Benchmark Media/Entertainment Radio Network (ERN) CEO, Alan, forcefully demanded that both I & Roy should "give" to Alan "a one fifth share" of the ownership of the then very valuable TRN (valued at around $80,000,000 at that time by Northeast Securities. Alan argued that even though he had had nothing to do with investing in, growing or rebuilding TRN from what had been a $10,000 repurchased shell when I took OTRN over back in 1998, that Alan should still receive the equivalent of around $16,000,000 (sixteen million dollars) of equity, or one fifth of TRN's shares, as "an advance on his inheritance" (or words to that effect).

34. To this demand, both I and Roy took turns explaining to Alan at that time that: (a) FHU was NOT a family owned or controlled business, but was a real 501(c)(3) nonprofit public benefit corporation; (b) as such, FHU was not inheritable, nor were its arm's length

business relationships "inheritable" by any family members; and c) Mark had incorporated TRN as TRN had been required to buy OTRN from FHU in 2004 as a "forced purchase" as an "emergency accommodation" to FHU in order help further salvage FHU from its far reaching nonprofit tax exempt court cases/status quagmire. In fact, it was explained to Alan by both Roy and me, that FHU's need to survive its 1998, 1999 and 2000 tax audit had been so very paramount in 2004 that TRN had agreed to buy OTRN from FHU to stop that audit from expanding into another three full years, which would have potentially exposed FHU to destruction at the hands of the IRS' nonprofit division.

35. Despite this explanation to him, Alan continued to demand at least a one fifth ownership share in TRN and to assert that FHU was "his inheritance" as well, and that FHU was something "owed to him" from Roy.

36. On December 31, 2013, I was present and participated in the drafting and delivery of documents to transfer all of TRN's intellectual property rights to FHU, in lieu of foreclosure of the note at issue in this Action, as the payments were then more than three months delinquent.

37. Starting in earnest by the end of 2016, Alan shifted his tactics to seeking to manipulate Roy, the then increasingly frail and chemically impaired FHU President, with a new constant stream of reckless, untrue accusations against me and my relationship with OTRN, FHU and Roy. And, after Alan gained control of FHU and the power of the FHU bank account by these improper tactics, he then enlisted others to echo these malicious accusations.

38. Alan's manipulation of Roy to achieve de facto control of FHU came to a head in late 2017, when Alan caused FHU personnel, including both Roy and Michael Masters, to

seize control of the TRN facilities in Central Point, and all of their contents, and evict all TRN personnel at gunpoint and by other physical force. One of those TRN personnel, Omar Corona, actually had a gun stuck in his face by Roy when being ordered to vacate the premises.

39. The seizure of the Central Point was just one further example of how Alan manipulated his way into control of FHU through lies and misrepresentations designed to damage both me and TRN and enhance his situation, and, in the process, to drive a rift between me & my father, as well as to destroy the arm's length relationship between FHU & the TRN companies at the hands of FHU as controlled by Alan.

40. The police were called to the TRN broadcast headquarters in Central Point due to the forceful seizure, and the Central Point police department arrested my then 89-year-old father for improper use of a firearm and menacing. A true and correct copy of the arrest mugshot and police report is attached as Exhibit "J" hereto.

41. Unfortunately, the police claimed they could do nothing to remove the FHU staff (then in possession of the facility when the police arrived) from the TRN broadcast headquarters after that arrest.

42. The concern for their safety, should TRN personnel attempt to return to their duties in Central point which was created by FHU's armed takeover of Central Point, was compounded by Roy leaving a voicemail message for Marcelo Corona (Omar's brother and the supervisor of the OTRN Central Point personnel) shortly afterwards.

43. Exhibit. "C" hereto is a true and correct audio copy of that voicemail message which was forwarded to me by Marcelo Corona. My father's voice is very distinctive. I can certify that I recognize the voice on that message as unmistakably being the voice of my

father, Roy Masters, and I further certify that virtually anyone who knows my father could certify that fact as well.

44.     Shortly after the dispossessing of the Central Point TRN broadcast Headquarters by physical force and gunpoint by the FHU, Alan (acting for FHU) contacted the satellite provider for the distribution of all of the syndicated radio programming to the radio station affiliates (Cumulus Media/Westwood One/Dial Global) to do a "hard disconnect" of the satellite that delivered all of the TRN branded programs (& distributed the newly created FHU entities as well) to all radio station affiliates.

45.     A "hard disconnect" of a satellite uplink actually results in the "force Majeure provision of the networks' auto renewing affiliation agreements to become automatically cancelled if not remedied within 24 hours. In other words, after 24 hours of a hard disconnect, the damage to a radio network's base of affiliated stations (the stations that actually broadcast the syndicated programming within their broadcast area) is devastated, and the damage to the syndicated programming core distribution becomes irreversible.

46.     This was all done in violation of a federal bankruptcy stay in place at that time, after David had caused a federal bankruptcy action to be filed to prevent the satellite feed from being terminated, which would have effectively ended all network operations, as a result of FHU's failure to make contracted syndication fee payments.

47.     By doing so, Alan caused the destruction of TRN's onetime $80,000,000 brand value, literally overnight.  Alan did this while he was also a direct competitor of TRN in his ERN capacity; doing so without being an authorized executive of TRN, or any of its subsidiaries, or any of the other affected syndication companies, acting by and through FHU to achieve his personal objectives.

48. Once done, this could never be undone, resulting in a one-time $80,000,000 brand loss. This also resulted in the loss of FHU's radio station affiliates for FHU's Advice Line program, with an actual value of to FHU approximately $200,000 per month, for which it was supposed to pay a little over $40,000 per month in syndication fees which it was failing and refusing to pay, all over a tiny $4500 per month satellite bill.

49. This act by FHU and Alan effectively destroyed all of that massive equity value of the TRN branded networks, as well as 20 years of "five star" gold plated network brand equity within the radio industry to their radio station affiliates.

50. Alan's self-centered and malicious actions in this regard also destroyed much of Roy's on air legacy, as that hard disconnect of the satellite feed also destroyed FHU's radio affiliate distribution for FHU's programming, and the only true way FHU could economically deliver its message in the post 1997 radio consolidation landscape, or rebuild its national auditory messaging/help ministry.

51. The pending motions and supporting documents allege without foundation that I have repeatedly attempted to take control of the FHU for my personal benefit. This is simply not true, and is quite the opposite. Between the years 1987 and 2016, I was the key executive in charge of developing and overseeing all of the FHU's key messaging and national radio distribution outreach for the foundation's national radio program and other philanthropic pursuits and received no pay for at least 28 of those 30 years. Let my record speak for itself as to my "self-interest".

52. It should be evident now that my actions have not been for the purpose of putting me in control. They were, instead, taken with lifelong familiarity with the FHU and its purposes, and Alan and his self-serving propensities. I very much desire to

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 11

honor, perpetuate, and ensure the continuation of, my father's legacy and the positive mission he sought to achieve, and for many years did achieve, with FHU.

53. My experience with the prior IRS audit, and the prospects for a coming future audit, have caused me to be deeply concerned that FHU be operated appropriately, as both a 501(c)(3) nonprofit and a bona fide church, on a continual basis. Alan's actions, as partially detailed in this declaration, have given rise to my sincere and well-founded belief that if Alan succeeds in his plot to take over FHU through his improper actions, he will destroy FHU's positive mission and my father's legacy and life's work, and, eventually, FHU itself through failure to comply with the requirements for its continued operation as 501(c)(3) nonprofit organization.

54. While my father was in full control of all of his faculties, he kept Alan at arm's length from FHU. Yet, as he aged and suffered from various maladies, including recurrent urinary tract infections, and overuse of medication combined with wine consumption, he became more susceptible to manipulation by Alan. I am concerned that if Alan is permitted to continue in control of FHU, FHU will be destroyed, along with my father's life work and legacy and the good that FHU will accomplish. I believe that Alan is using FHU to enrich himself personally and to promote his personal business, ERN, including by destroying the TRN branded networks to eliminate competition for his company, and to utilize and weaponize FHU for that purpose. I am convinced that his actions as addressed in this declaration demonstrate the validity of these concerns.

55. I am also concerned that Alan is pursuing this action without foundation for the purpose of destroying TRN, solely for his personal benefit. As noted, Alan was and remains a network radio competitor of the TRN networks. For over 13 years, Alan was and, to my

knowledge, still is the owner of ERN as well as "Benchmark Media". As such, he is using FHU and donor funds, contributed to FHU for its nonprofit mission, to destroy TRN for his personal business advantage unrelated to FHU or its mission.

56. It is my belief that Alan has participated in a broad range of improper behaviors, including but not limited to collusion, conspiracy, anti-competitive acts, and elder abuse.

57. Attached as Exhibit "D" hereto is a true and correct copy of Roy's $1,257,000 elder abuse law lawsuit against Alan for elder abuse, bad faith abuses of a religious congregation for donations, fraudulent inducement, theft, and illegal conversion of assets, among many other claims. Sadly, Alan was able to manipulate Roy into having that action dismissed by the same tactics and actions as he utilized in taking advantage of the age and infirmities of Roy to take control of FHU (from which Alan had been excluded before Roy's declining condition had made Roy susceptible to Alan's manipulation).

58. Such actions also included a purported removal of Mark and David from FHU's board in September of 2016 by forgery of at least two names - that of Roy and the reverend Jesse Lee Peterson.

59. A true and correct copy of a purported September 2016 removal document is attached as Exhibit "E" hereto.

60. A true and correct copy of an email from Jesse Lee Peterson confirming that he did not participate in any such board meeting in 2016, is attached as Exhibit "F" hereto.

61. Similarly, the signature of Roy on such removal document is further evidence of a forgery concocted by Alan, as Roy would have always known that, as the founder of FHU, he did not need a board meeting or board approval to remove directors, and that the board did not even have the power to remove a director, as the founder had the sole power to appoint

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 13

and remove directors.  However, in late 2016 Alan did not know that yet, nor did he know that Jesse Lee Peterson hadn't been on the FHU board "in years".

DATED: September 20, 2021

_____
Mark Masters

DECLARATION OF MARK MASTER'S IN SUPPORT OF RESPONSE TO PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER

Page 14